IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ROBERT ROBINSON,**                                   Case No. 1:15 CV 426

      Petitioner,                                   Judge Patricia A. Gaughan

      v.                                   Magistrate Judge James R. Knepp, II

**ALAN J. LAZAROFF, Warden,**

      Respondent.                                   REPORT AND RECOMMENDATION

## INTRODUCTION

Petitioner Robert Robinson ("Petitioner"), a prisoner in state custody, filed a petition seeking a writ of habeas corpus under 28 U.S.C. § 2254 ("Petition"), and a memorandum in support of that petition. (Docs. 1, 1-1). Respondent Warden Alan Lazaroff ("Respondent") filed a Return of Writ (Doc. 7) with attached exhibits (Doc. 7-1), and Petitioner filed a Traverse[1] (Doc. 11). The district court has jurisdiction over the Petition under § 2254(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). (Doc. 4). For the reasons discussed below, the undersigned recommends the petition be denied.

## FACTUAL BACKGROUND

Factual findings of state courts of appeals are presumed correct unless a petitioner rebuts them with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013). This presumption of correctness applies to factual findings of the court of appeals based on the state trial court record. *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001).

---

1. Rule 5(e) of the Rules Governing Section 2254 Cases now uses the term "Reply" instead of "Traverse". *See* Advisory Committee Notes to Rule 5 of Rules Governing Section 2254 Cases (2004 Amendments).

The Eighth District Court of Appeals, Cuyahoga County, made the following findings of fact:

{¶ 2} Robinson and codefendant Jeremy Logan were charged in a ten-count indictment: aggravated murder and two counts of murder involving one victim (Counts 1–3), six counts of felonious assault involving six different named victims (Counts 4–9), and discharging a firearm on or near prohibited premises (Count 10). All counts included one-, three-, and five-year firearm specifications.

{¶ 3} Robinson pleaded not guilty to the charges, and the state voluntarily dismissed the aggravated murder charge prior to trial. The matter proceeded to a jury trial. The charges arose out of the fatal shooting of Dena'Jua Delaney ("Bubbles") on February 22, 2012, around 3:15 in the afternoon. The incident took place on Garfield Road (a.k.a. "The One Way"), a one-way residential street in East Cleveland, stemming from two competing groups of people squaring off to fight.

{¶ 4} At trial, the state presented 25 witnesses, including 17 eyewitnesses, each who offered slightly varied accounts of the events in question. We summarize the following pertinent facts from the evidence presented at trial.

{¶ 5} The night before the fatal shooting, on February 21, 2012, Russell Stokes and Latima Brown got into a heated altercation after a night of hanging out and drinking at Latima and Bubbles's East Cleveland apartment. Russell ultimately left the apartment after threatening Latima. At the time, Russell was "staying" nearby at his aunt's house on The One Way.

{¶ 6} The next day, Russell called his best friend, S.P. [footnote omitted], who was Robinson's girlfriend at the time, and told her to "beat up" Latima. Consequently, S.P., along with her sister and two friends, D.B. and B.D., went over to The One Way to fight Latima.

{¶ 7} According to Latima, she received a call the next day from Russell, telling her to go outside, where she encountered three females coming down The One Way to meet her. Although witnesses offered various accounts of the fight that ensued, Latima returned to her apartment after the fight with apparent injuries, including a "bloody face," and was upset. This prompted Bubbles to call many of her family and friends, asking them to meet on The One Way "to fight."

{¶ 8} According to Latima, approximately 15 people—nine females and six males—congregated outside of her and Bubbles's apartment building in response to Bubbles's calls. Other witnesses estimated approximately 20 to 30 people gathered. The group ranged in ages from late teens to early 20s.

2

{¶ 9} Amongst the calls Bubbles made, Russell received one. He testified that Bubbles stated "you all jump my best friend" and now "you just signed your death certificate."

{¶ 10} Russell, in turn, called S.P. According to S.P., she got a call, "saying that they was trying to jump Russell, they outside trying to jump Russell and stuff. And then I called—my boyfriend"—Robinson. S.P. told Robinson, "come get me, they're about to jump my best friend Russell." Robinson, who drove a two-door gold Saturn, picked up codefendant, Jeremy Logan, S.P., and her two friends, D.B. and B.D., and drove to The One Way. According to Logan, Robinson called and asked him to accompany him to The One Way "because he didn't want to be up there by himself in a fight."

{¶ 11} When Robinson arrived on The One Way, a mob quickly convened near Robinson's car, which had stopped near Russell's aunt's house. According to Russell, he ran back inside his aunt's house once he realized that they were "outnumbered." According to S.P., she jumped out of the car, and a heated altercation ensued. D.B. and B.D. never left the car. Ultimately, when all five occupants were seated in the car, Devere Ealom, a friend of Bubbles, ran up to the front seat passenger side of the vehicle and punched Logan in the face. The eyewitnesses' accounts of what happened next, including the fatal shooting of Bubbles, conflict.

{¶ 12} According to the majority of the eyewitnesses present, after Logan was punched, the car moved slightly forward, allowing Logan to position himself on the door jamb and hang his upper body outside the car while he fired several shots above the car toward the crowd of people behind the car on Garfield Road. The witnesses characterized this as the first round of shots. Following Logan's firing of his gun, Robinson fired his gun out his window and toward "the back of the car." This was characterized as the second round of shots. Several witnesses testified that Bubbles was standing after the first round of shooting but not after the driver (Robinson) shot his gun. After Bubbles fell to the ground, Robinson drove off.

{¶ 13} According to Bubbles's friends and family, no one from the crowd ever fired any shots at the car until after Bubbles had already fallen down. Instead, these witnesses testified that someone from the crowd fired what sounded like a shotgun following the screaming that Bubbles was down. Even Russell Stokes—Robinson's girlfriend's best friend—testified that first there were shots fired from the car, a couple of people hit the ground, the car took off, and then someone from the crowd "got to busting [shooting]" toward the car while the car was moving away. The same shooter then apparently spotted Russell in the window, "[h]e shoot toward the house, shot in the corner of the window, the room that we was in."

3

{¶ 14} Conversely, Robinson (through his statement to the police) and Logan (through his testimony at trial) stated that someone from the crowd was shooting at their car. According to B.D. and D.B., also passengers in Robinson's car, there were gunshots at the car. D.B. testified, however, that the first shots came from the "boys in the front seat"—Robinson and Logan. S.P. never mentioned any shooting directed at the car. According to her, Logan fired at least four or five shots toward the crowd of people. She further testified that after they pulled away from The One Way, Logan said, "Ah, I shot someone. I'm going to break my phone. What am I going to do?"

{¶ 15} East Cleveland police responded to the call of gunshots and victim down. East Cleveland police detective Reginald Holcomb testified that, through initial interviews at the scene, the police quickly learned that Jeremy Logan was a passenger in the car and had fired his gun into the crowd. They further recovered Logan's gun, a Rossie .38 Special revolver, based on an anonymous tip called into the station, which Logan acknowledged as being his gun after being called in by the police. Robinson, likewise, turned himself into the police and ultimately admitted to firing a single shot "out the window towards the back of [his] car." According to Robinson's statement, someone from the crowd fired a single round first, then Logan fired his gun, and then someone from the crowd fired another one or two shots. At that point, Logan told Robinson that "his gun was messing up" so Robinson fired a single shot and then they drove away. Based on Robinson's admission, the police also recovered Robinson's gun, a .38 caliber Smith & Wesson revolver.

{¶ 16} Immediately following the shooting, the police recovered a bullet from the windowsill of the upstairs residence at 1826 Garfield Road. They also recovered a bullet fragment from a .32 caliber discovered in the front yard of 1824 Garfield Road. The fragment and bullet were later determined to both be .32 calibers. According to Andrew Chappell, a forensic scientist qualified "in the area of firearms comparison and ballistics comparison," the fragment and bullet recovered from the residence could not have been shot out of either one of the firearms recovered from Robinson and Logan because their revolvers were .38 caliber.

{¶ 17} The police, however, recovered a .38 Special/.357 Magnum caliber bullet found near the victim. According to Chappell, he "was able to eliminate the Rossie revolver as being the gun that fired the bullet based on a difference in class characteristics." With respect to Robinson's gun, the Smith & Wesson pistol, "it was found to have the same class characteristics; however, the first bullet didn't have sufficient individual characteristics" to conclusively say that it was fired from Robinson's gun. Chappell explained that the lack of "sufficient individual characteristics" could be attributed to a variety of causes, including the bullet passing through bone.

4

{¶ 18} The state additionally offered the testimony of deputy medical examiner Dr. Andrea McCollom, who testified that the victim died from a gunshot wound of the face with skull and brain injuries. According to Dr. McCollom, the victim's entrance wound was "lateral to the right eye" and there was a "two and a half by three and a half inch area of stippling of the right face, including the upper eyelid." She further identified an exit wound of the bullet out of the victim's scalp. Dr. McCollom testified that the victim suffered a deadly injury that ordinarily would cause a person to lose consciousness immediately. On cross-examination, Dr. McCollom explained that the injury inflicted to the victim would cause someone to fall. She further indicated that the angle of the bullet was "slightly downward" and that the existence of stippling was indicative of an "intermediate range gunshot wound." Specifically, she explained that the range "is up to about three feet."

{¶ 19} After the presentation of the state's case, Robinson moved for an acquittal of all the charges under Crim.R. 29. The trial court granted it with respect to one of the felonious assault counts (Count 9).

{¶ 20} As part of the jury instructions, the trial court instructed the jury on aiding and abetting with respect to the state's alternative theory that Robinson aided and abetted Logan in the commission of the crimes.

(Ex. 14, Doc. 7-1 at 200-05); *Ohio v. Robinson*, 2013 WL 5517978, at *1-4 (Ohio Ct. App., Oct. 3, 2013).

## PROCEDURAL BACKGROUND

*State Court Conviction*

The January 2012 term of the Cuyahoga County Grand Jury indicted Petitioner on one count of aggravated murder in violation of Ohio Revised Code § 2903.01(A) (Count 1); two counts of murder in violation of § 2903.02(A) and (B) (Counts 2 & 3)[2]; six counts of felonious assault in violation of § 2903.11(A)(2) (Counts 4-9); and one count of discharging a firearm on or near prohibited premises in violation of § 2923.161(A) (Count 10). (Ex. 1, Doc. 7-1, at 3-13).

---

2. Ohio Revised Code § 2903.02(A) is murder ("No person shall purposely cause the death of another . . ." and § 2903.02(B) is felony murder ("No person shall cause the death of another as a proximate result of the offender's committing an offense of violence that is a felony in the first or second degree . . .").

Each charged carried one, three, and five-year firearms specifications. *Id.* On March 26, 2012, Petitioner pleaded not guilty to all charges. (Ex. 2, Doc. 7-1, at 14).

Before trial, the state recommended dismissal of Count 1 (aggravated murder) without prejudice and corrected Count 3 to read "did purposely cause the death of Dena'Jua Delaney." (Ex. 3, Doc. 7-1, at 15). At the end of the trial, Defendant moved for a Criminal Rule 29 acquittal, which the court denied. (Ex. 4, Doc. 7-1, at 16). The court granted the motion as to Count 9 (one of the felonious assault charges). (Ex. 7, Doc. 7-1, at 28). The jury found Petitioner guilty on Counts 2, 4, 5, 6, 7, 8, and 10, and found him guilty of the one and three-year firearms specifications on each charge, but not guilty on the five-year specifications. (Exs. 7 & 8, Doc. 7-1, at 28-29; 30-64). The jury found Petitioner not guilty on Count 3 (purposely causing the death of Delaney). *Id*. at 28. Petitioner then filed a written motion for acquittal (Ex. 5, Doc. 7-1, at 17-24), which the State opposed (Ex. 6, Doc. 7-1, at 25-26), and the court denied (Ex. 9, Doc. 7-1, at 65).

On November 21, 2012, the court sentenced Petitioner to life in prison with the possibility of parole after fifteen years, consecutive to a term of three years on the firearm specification (Count 2); two years each the felonious assault convictions (Counts 4-8) to be served concurrently with each other, and concurrently with Count 2; three years for Count 10 to be served consecutively to the sentence on Count 2; and an additional consecutive three years for the merged firearm specifications. (Exs. 9 & 10, Doc. 7-1, at 65-67).

*Direct Appeal*

Petitioner filed a notice of appeal with the Eighth District Court of Appeals on December 18, 2012. (Ex. 11, Doc. 7-1, at 68). Petitioner raised fifteen assignments of error in his brief:

1. Robert Robinson's conviction for felony murder is not supported by legally sufficient evidence as required by state and federal due process.

6

2. Robert Robinson's convictions for felonious assault are not supported by legally sufficient evidence as required by state and federal due process.

3. Robert Robinson's conviction for the first-degree felony is not supported by legally sufficient evidence as required by state and federal due process.

4. Robert Robinson's convictions are against the manifest weight of the evidence.

5. The trial court erred in instructing the jury that it could find Robinson guilty of aiding and abetting Jeremy Logan when there was no evidence that Robinson aided and abetted Logan's criminal conduct.

6. The trial court erred in refusing to give a curative instruction and in failing to grant a mistrial after a witness testified that Robinson was "in prison."

7. Robert Robinson was denied his due process right to a fair trial as a result of prosecutorial misconduct.

8. Robert Robinson was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Section 10 of the Ohio Constitution.

9. The trial court erred and violated Robert Robinson's constitutional right to a fair trial when it admitted an irrelevant and prejudicial photograph.

10. Robert Robinson's convictions violate due process because they are inconsistent with the not guilty verdicts within the same counts on the 5-year firearm specifications.

11. Robert Robinson's conviction for felony murder based on the predicate offense of felonious assault violate the common law felony murder merger doctrine and Robinson's rights under the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article 1 of the Ohio Constitution.

12. The cumulative errors committed in this case deprived Robert Robinson of a fair trial.

13. The trial court erred by convicting and sentencing Robert Robinson to consecutive sentences on allied offenses of similar import.

14. The trial court erred by convicting and sentencing Robert Robinson for a first-degree felony violation of discharge of firearm on or near prohibited premises

when the verdict form failed to identify the degree of the offenses or the aggravating elements as required by R.C. 2945.75.

15. The trial court imposed a sentence contrary to law and violated Mr. Robinson's right to due process when it ordered consecutive sentences without stating the requisite statutory findings on the record.

(Ex. 12, Doc. 7-1, at 75-163). The state filed a brief in response. (Ex. 13, Doc. 7-1, at 164-96). On October 3, 2013, the Eighth District Court of Appeals affirmed Petitioner's convictions, but vacated the imposition of consecutive sentences for felony murder (Count 2) and first-degree discharging a firearm on or near prohibited premises (Count 10), as they were allied offenses of similar import that should have been merged. (Ex. 14, Doc. 7-1, at 197-242). The court remanded for resentencing and instructed the state to elect which charge would merge with the other for sentencing. *Id.* at 237-39.

Before resentencing, Petitioner filed a motion to reconsider with the appellate court, arguing:

1. Manifest Weight/Sufficiency: This court incorrectly sustained Robinson's felony murder conviction on a legal theory that was never argued by the State and was indeed mocked by the State below.

2. Manifest Weight: This Court's resolution of Robinson manifest weight arguments depend upon contradictory interpretations of the basis for the jury's verdict.

3. Manifest Weight/Prosecutorial Misconduct: The State's improper argument regarding the expert testimony prejudiced Robinson because it caused the jury to lose its way.

4. Prosecutorial misconduct and Ineffective Assistance of Counsel: Proof of prejudice in the context of ineffective assistance of counsel involves a different and much lower standard of prejudice than plain error.

(Ex. 15, Doc. 7-1, at 243-54). The state opposed (Ex. 16, Doc. 7-1, at 255-63), and on November 7, 2013, the appellate court denied the motion (Ex. 17, Doc. 7-1, at 264).

8

On December 19, 2013, Petitioner filed a notice of appeal with the Ohio Supreme Court. (Ex. 18, Doc. 7-1, at 265-66). In his memorandum in support of jurisdiction, Petitioner set forth ten propositions of law:

1. An appellate court may not affirm a criminal conviction based in whole or in part on a legal theory never presented by the State to the jury.

2. A guilty verdict is not supported by legally sufficient evidence if the inferences necessary to support that verdict are unreasonable given the physical evidence.

3. In order to obtain a conviction of felonious assault based on an attempt to cause physical harm by shooting a gun, the State must present evidence that the victim was in the line of fire.

4. A criminal defendant is denied a fair trial when the prosecutor improperly attacks the most critical piece of exculpatory evidence during his closing argument.

5. A criminal defendant is denied the effective assistance of counsel when his attorney fails to object to a prosecutor's improper attacks on the most critical piece of exculpatory evidence in his case.

6. An aiding and abetting instruction is not proper when the co-defendant's act of shooting was an unplanned, spontaneous response to being attacked.

7. When the State does not present legally sufficient evidence that the co-defendant shot the decedent in a felony murder case, the trial court cannot instruct the jury that it could find the defendant guilty as an accomplice.

8. Like being compelled to stand trial in prison clothes, the introduction of evidence that defendant is "in prison" can never be deemed harmless error.

9. The trial court's failure to, at a minimum, give a curative instruction when the jury is informed that the defendant is "in prison" cannot be harmless error when an appellate court recognizes that the evidentiary arguments were "compelling" and presented a "very close call."

10. A felony murder conviction under R.C. 2903.02 requires proof of an "offense of violence" that is independent of the felonious assault inherent in every murder.

11. A defendant's due process rights are violated when a jury reaches irreconcilable conclusions on a specification and its underlying offense.

(Ex. 19, Doc. 7-1, at 267-333). The state opposed (Ex. 20, Doc. 7-1, at 334-44), and on March 26, 2014, the Ohio Supreme Court declined to accept jurisdiction of Petitioner's appeal (Ex. 21, Doc. 7-1, at 345).

On May 29, 2014, the Cuyahoga County Court of Common Pleas resentenced Petitioner pursuant to the remand order from the Eighth District Court of Appeals. (Ex. 22, Doc. 7-1, at 346-47). The court noted Counts 2 and 10 merged for sentencing and the state elected to proceed on Count 2. *Id.* at 346. The court issued the same sentence, except the sentence for Count 10 was ordered to be served concurrently with his life sentence, rather than consecutively. *Id.* The three-year sentence for the merged firearm specifications remained consecutive to the life sentence. *Id.*

### FEDERAL HABEAS CORPUS

Petitioner, through counsel, filed the instant habeas petition on March 5, 2015, challenging his judgment of conviction. (Doc. 1). Petitioner alleges six claims for relief:

1. Petitioner's convictions for felony murder under O.R.C. 2903.02(B) and F-1 discharging a weapon on or near prohibited places under O.R.C. 2923.162(A)(3) are not supported by legally sufficient evidence as required by the Fifth and Fourteenth Amendments to the United States Constitution.

2. Petitioner's convictions for felonious assault are not supported by legally sufficient evidence as required by the Fifth and Fourteenth Amendments to the United States Constitution.

3. Petitioner's due process rights under the Fourteenth Amendment and his Sixth Amendment right to a fair trial were violated when the State court affirmed his conviction in whole or in part on a legal theory never presented to the jury.

4. Petitioner's due process rights were violated when the trial court refused to give a curative instruction or grant a mistrial to remedy the improper testimony that Petitioner is "in prison."[3]

5. Petitioner's due process rights to a fair trial under the Fourteenth Amendment were violated by prosecutorial misconduct during closing argument.

---

3. Petitioner later withdrew this claim for relief. (Doc. 11, at 8 n.4).

    6. Petitioner was denied effective assistance of counsel in violation of the Sixth
       and Fourteenth Amendments to the United States Constitution.

(Docs 1 & 1-1).

### STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "dictates a highly deferential standard for evaluating state-court rulings which demands that state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005). An application for habeas corpus cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d). Thus, a court may grant habeas relief if the state court arrives at a conclusion that is contrary to a decision of the Supreme Court on a question of law, or if the state court decides a case differently than did the Supreme Court on a materially indistinguishable set of facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The appropriate measure of whether a state court decision unreasonably applied clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Williams*, 529 U.S. at 409–11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in

11

justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

**DISCUSSION**

***Exhaustion & Procedural Default***

Petitioners must exhaust state court remedies prior to raising claims in federal habeas corpus proceedings. *See* 28 U.S.C. § 2254(b),(c). This requirement is satisfied when a Petitioner has given "the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the state's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *See id.*; *Picard v. Connor*, 404 U.S. 270, 275-77 (1971). In order to satisfy the fair presentation requirement, a habeas petitioner must present both the factual and legal underpinnings of his claims to the state courts. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). The claims must also be presented to the state courts as federal constitutional claims. *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984). In reviewing the state court proceedings to determine whether a petitioner has "fairly presented" a claim to the state courts, courts have looked to the petitioner's:

> (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.

*Whitings v. Burt*, 395 F.3d 602, 613 (6th Cir. 2005).

Related to exhaustion is the issue of procedural default. First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his

12

claim to the appropriate state court. *Lundgren v. Mitchell,* 440 F.3d 754, 763 (6th Cir. 2006) (citing *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977)); *see also Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir. 1986). If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Second, a petitioner may procedurally default a claim by failing to raise the claim in state court, and pursue that claim through the state's "ordinary appellate review procedures." *O'Sullivan*, 526 U.S. at 847. In Ohio, this means a defendant must fairly present his constitutional claims on the record to the trial court, the court of appeals, and the Supreme Court of Ohio on direct appeal. *Caver v. Straub*, 349 F.3d 340, 346 (6th Cir. 2003).

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice. *See Lundgren*, 440 F.3d at 763. Petitioner's prosecutorial misconduct claim and challenge to the aiding and abetting jury instruction are procedurally defaulted. He diligently raised the remainder of his federal claims through the state court process in accordance with state rules. Therefore, the undersigned will address the merits of each of Petitioner's claims below, and engage in a more thorough procedural default analysis when addressing the two noted claims.

***Grounds One & Two: Sufficiency of the Evidence (Due Process)***

In Ground One, Petitioner argues his convictions for felony murder under Ohio Revised Code § 2903.02(B), and for discharging a weapon on or near prohibited places under § 2923.162(A)(3) violate due process as they are not supported by legally sufficient evidence. He

contends this is so because both charges required the State to prove he shot Bubbles and there was insufficient evidence of this fact, and as well as insufficient evidence to show he acted "knowingly." In Ground Two, Petitioner contends his conviction for felonious assault under § 2903.11(A)(2) is not supported by sufficient evidence because the State did not prove the victims were "in the line of fire." Respondent contends there was sufficient evidence on which to convict Petitioner of all three charges.

The standard for sufficiency of evidence is: "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. Consistent with the deference given to the trier of fact's resolution of conflicts in evidence, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson,* 443 U.S. at 326. In applying this standard, the federal court is bound by the substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16. Furthermore, a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

As such, the reviewing court is not permitted to reweigh evidence or in any way substitute its own opinion for that of the trier of fact. *United States v. Fisher*, 648 F.3d 442, 450

(6th Cir. 2011) (citing *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009)). "[T]he *Jackson* inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original). Due process is satisfied as long as such evidence is enough for a rational trier of fact to make a permissible inference of guilt, as opposed to a reasonable speculation that the petitioner is guilty of the charged crime. *Newman v. Metrish*, 543 F.3d 793, 796-97 (6th Cir. 2008).

Further, it is important to note the double deference applicable; first, the deference accorded to the trier of fact's verdict by *Jackson*, and second, the deference to the state court's consideration of the verdict under AEDPA.[4] *See Tucker v. Palmer,* 541 F.3d 652, 656 (6th Cir. 2008); *see also Brown*, 567 F.3d at 205 (finding even if a rational trier of fact could not have found petitioner guilty, the habeas court must defer to the state appellate court's sufficiency determination so long as it is reasonable). "[T]he *Jackson v. Virginia* standard is so demanding that '[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'" *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)); *see also Cavazos v. Smith*, — U.S. —, 132 S. Ct. 2, 3 (2011) ("Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.").

*Felony Murder (Ground One)*

---

4. Petitioner argues the "double deference" under AEDPA does not apply because the state appellate court violated his due process rights in upholding his conviction. (Doc 11, at 9). Because the undersigned concludes *infra* that the state appellate court did not do so, AEDPA double deference is applicable to this claim.

In his first ground for relief, Petitioner challenges the sufficiency of the evidence to support his felony murder conviction. Under Ohio law, "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree". Ohio Rev. Code § 2903.02(B). To support the count of felony murder, the state relied on felony assault of Bubbles[5] as its predicate offense. Under Ohio felony assault law, "[n]o person shall knowingly . . . [c]ause or attempt to cause physical harm to another . . . by means of a deadly weapon or dangerous ordnance." *Id.* § 2903.11(A)(2).

The Ohio appellate court addressed Petitioner's sufficiency challenge to his felony murder conviction as follows:

{¶ 29} The underlying felony giving rise to the felony murder was felonious assault against Bubbles. Thus, to support the count of felony murder, the state had to present sufficient evidence that Robinson caused the death of Bubbles as a proximate result of his felonious assault against her.

{¶ 30} Under R.C. 2903.11(A)(2), felonious assault, "[n]o person shall knowingly* * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

{¶ 31} Robinson argues that the state's evidence is deficient in two respects: (1) that it failed to present legally sufficient evidence that he shot Bubbles and caused her physical harm, and (2) that it failed to prove that he acted "knowingly." We find no merit to Robinson's sufficiency challenge. Indeed, Robinson acknowledges that several eyewitnesses testified that they saw Bubbles "go down" after Robinson fired his gun. And these witnesses testified that there was no shooting from the crowd directed toward the car or anywhere else until after Bubbles went down.

{¶ 32} For example, Paul Small, who lives on Garfield Road—and was not a party to either group that congregated on Garfield Road for the fight—testified that he watched from his window and observed "the car speeded off, dude [front seat passenger] got up out of the car and shot twice." Small explained that the car "was rolling slow * * *; [s]low enough for him to shoot. He shot twice and the

---

5. In the interest of clarity, and consistency with the state court opinion, the undersigned will use the victim, Dena'Jua Delaney's nickname, "Bubbles".

16

gun got jammed." Small further testified that the two shots were followed by another shot from the driver's side and that following the driver's shot, Bubbles dropped to the ground. According to Small, someone from the crowd—not the car—started to shoot at his neighbor's house after Bubbles went down.

{¶ 33} Similar to Small's testimony, Antonio Delaney, Bubbles's brother, testified that after the driver (Robinson) started firing his gun, "that's when Bubbles had dropped." And several other witnesses—at least four other eyewitnesses from Bubbles's group—echoed this testimony, testifying that they saw Bubbles lying on the ground after the driver started shooting. Although they specifically did not see Bubbles fall at the exact moment, they identified the driver (Robinson) as the only shooter before Bubbles fell.

{¶ 34} Further, through forensic scientist Andrew Chappell's testimony, the state established that the bullet recovered from Bubbles had the "same class characteristics" of Robinson's firearm, a Smith & Wesson .38 revolver. In other words, the bullet that killed Bubbles was capable of being fired from the type of firearm used by Robinson.

{¶ 35} Contrary to Robinson's assertion, construing this evidence in a light most favorable to the state, only one reasonable inference can be drawn: Robinson shot Bubbles. To the extent that Robinson argues that this inference is not reasonable based on other evidence contradicting it, such an argument amounts to an attack of the weight of the evidence, which we will address separately under our manifest weight analysis.

{¶ 36} Next, Robinson argues that the state failed to prove that he acted "knowingly." He contends that the evidence only established that he acted "recklessly." We disagree.

{¶ 37} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶ 38} It is common knowledge that a firearm is an inherently dangerous instrumentality, use of which is reasonably likely to produce serious injury or death. *State v. Widner,* 69 Ohio St.2d 257, 270, 431 N.E.2d 1025 (1982). This court has consistently held that "shooting a gun in a place where there is risk of injury to one or more persons supports the inference that the offender acted knowingly." *State v. Hunt,* 8th Dist. Cuyahoga No. 93080, 2010–Ohio–1419, ¶ 19, citing *State v. Brooks,* 44 Ohio St.3d 185, 192, 542 N.E.2d 636; *see also State v. Ivory,* 8th Dist. Cuyahoga No. 83170, 2004–Ohio–2968, ¶ 6; *State v. Jordan,* 8th Dist. Cuyahoga No. 73364, 1998 Ohio App. LEXIS 5571, 1998 WL 827588 (Nov. 25, 1998). Notably, "[e]ven firing a weapon randomly at victims arguably within range of the shooter is sufficient to demonstrate actual intent to cause

physical harm." *Ivory* at ¶ 6, citing *State v. Phillips*, 75 Ohio App.3d 785, 600 N.E.2d 825 (2d Dist.1991); *State v. Owens*, 112 Ohio App.3d 334, 678 N.E.2d 956 (11th Dist.1996).

{¶ 39} Here, Robinson admitted to shooting his gun into the crowd of people. Further, the majority of the eyewitnesses who testified indicated that Robinson fired his gun several times into the crowd and that Bubbles "went down" after Robinson fired. The state presented, through both direct and circumstantial evidence, that Robinson fired his gun out of his car toward Bubbles.

{¶ 40} As for Robinson's claim that his conduct was merely "reckless" because the crowd had already dispersed, we find his claim unsupported by the record. Based on the collective testimony of the eyewitnesses, a crowd of at least 15 to 20 people was congregated behind Robinson's car when he fired his gun into the crowd. While the scene was definitely chaotic, we cannot say that the evidence established that the crowd had dispersed. To the contrary, one witness testified that she was standing behind the car "in shock" when Robinson started firing toward the crowd. Accordingly, we find that there was sufficient evidence that Robinson acted "knowingly" rather than "recklessly" in firing his gun.

{¶ 41} Having found that the state presented sufficient evidence to support the single count of felony murder, we overrule Robinson's first assignment of error.

(Ex. 14, Doc. 7-1 at 201-11); *Robinson*, 2013 WL 5517978, at *5-6.

Petitioner raises two challenges to the appellate court's resolution of his claim. First, he contends no reasonable finder of fact could have concluded he shot Bubbles because such an inference is contradicted by the physical evidence: the medical examiner's testimony that Bubbles was shot from within three feet. Second, he contends the state did not provide sufficient evidence he acted "knowingly." Upon review of the evidence presented and the applicable law, the undersigned recommends the court find there was sufficient evidence to uphold Petitioner's conviction for felony murder and the appellate court's decision was not unreasonable.

First, the state presented sufficient evidence from which a reasonable jury could conclude Petitioner acted "knowingly". Under Ohio law, "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such

circumstances probably exist." Ohio Rev. Code § 2901.22(B). As the appellate court noted, under Ohio law, "shooting a gun in a place where there is a risk of injury to one or more persons supports the inference that the offender acted knowingly." *Robinson*, 2013 5517978, at *6 (citing, *inter alia*, *State v. Hunt*, 2010 WL 1254195 (Ohio Ct. App., April 1, 2010). This, combined with evidence presented that Petitioner shot toward Bubbles, is sufficient evidence for a jury to conclude Petitioner acted knowingly, and the appellate court's decision so finding is not objectively unreasonable.

Second, as the appellate court found, "several witnesses testified that they saw Bubbles 'go down' after Robinson fired his gun. And these witnesses testified that there was no shooting from the crowd directed toward the car until after Bubbles went down." *Robinson*, 2013 WL 5517978, at *5. The state presented evidence in the form of testimony from Paul Small and Antonio Delaney that Bubbles fell to the ground after Petitioner shot his gun (Tr. 635, 615-16).[6] Other witnesses, including Latima Brown, Devin Delaney, Darylisa Crenshaw, also testified that Bubbles was still standing after the shots from the passenger, but was on the ground after the driver shot. (Tr. 285-86, 427-28, 407-08). Several witnesses also testified that no other shots were fired before Bubbles fell. (Tr. 290-82, 408-10, 432-33, 593-95, 604). Additionally, forensic scientist Andrew Chappell testified that the bullet found near Bubbles was capable of being fired from the type of firearm used by Robinson. (Tr. 690). Taking the evidence in the light most favorable to the prosecution, this is sufficient evidence from which a jury could conclude Petitioner "cause[d] the death of" Bubbles "as a proximate result of . . . committing or attempting

---

6. The transcript of Petitioner's trial consists of six volumes. Volume 1 consists of transcript pages 1-221 (Doc. 8-1); Volume 2 consists of pages 222-498 (Doc. 8-2); Volume 3 consists of pages 499-759 (Doc. 8-3); Volume 4 consists of pages 760-852 (Doc. 8-4); Volume 5 consists of pages 853-1081 (Doc. 8-5); and Volume 6 consists of pages 1082-1138 (Doc. 8-6).

to commit" felonious assault on Bubbles. Ohio Rev. Code § 2903.02(B). This is so despite the evidence cited by Petitioner to the contrary.

Petitioner raises valid questions and a persuasive argument as to the evidence; however, inconsistencies are not enough to overturn the determinations made by the state court. Petitioner's argument is ultimately based on the weight assigned to various testimonial evidence and it is not the undersigned's role to weigh that evidence in the first instance. Here, the jury opted to believe the testimony of eyewitnesses over the contradictory testimony from the medical examiner and it is not the place of this Court to overturn such determinations. *See Cavazos*, 132 S. Ct. at 6-7; *Jackson*, 443 U.S. at 326 ("[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."). A rational trier of fact could find Petitioner guilty beyond a reasonable doubt of felony murder based on the evidence presented and the state appellate court's application of the law to these facts was objectively reasonable. Therefore, the undersigned recommends denying this portion of Ground One.

*Discharging a Weapon on or Near Prohibited Places (Ground One)*

Also in his first ground, Petitioner challenges his first degree felony conviction for discharging a weapon on or near prohibited places. Under Ohio law, "[n]o person shall . . . discharge a firearm upon or over a public road or highway." Ohio Rev. Code § 2923.162(A)(3). If "the violation caused serious physical harm to any person", such a violation is a first degree felony. *Id.* § 2923.162(C)(4). The Ohio appellate court addressed Petitioner's sufficiency challenge to this count:

> {¶ 48} Robinson was convicted of the first-degree felony of discharging a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3) and (C)(4).

The state therefore was required to prove that (1) Robinson discharged a firearm upon or over a public road or highway; and (2) the discharge of the firearm "caused serious physical harm to any person." *Id.* The indictment named Bubbles as the victim.

{¶ 49} Although Robinson concedes that he shot his firearm from a vehicle upon a public road, he argues that the state failed to prove that his shot hit Bubbles to elevate the crime to a first-degree felony. He raises the same arguments that we have already rejected under his sufficiency challenge to the felony murder count. Accordingly, we overrule the third assignment of error.

(Ex. 14, Doc. 7-1 at 214); *Robinson*, 2013 WL 5517978, at *8.

Because this claim rests on the same argument as Petitioner's first claim—that there was insufficient evidence to prove he shot Bubbles—and, as discussed above, this claim fails, the undersigned also recommends this portion of Petitioner's first ground be denied.

*Felonious Assault (Ground Two)*

In his second ground, Petitioner challenges the sufficiency of the evidence to support his five felonious assault convictions. Under Ohio law, "[n]o person shall knowingly . . . [c]ause or attempt to cause physical harm to another . . . by means of a deadly weapon or dangerous ordnance." Ohio Rev. Code § 2903.11(A)(2).

The Ohio appellate court found, with regard to this sufficiency challenge:

{¶ 42} In his second assignment of error, Robinson argues that the state failed to present sufficient evidence to support the five felonious assaults with respect to Darylisa Crenshaw, Latima Brown, Kayla Moorer, Devin Delaney, and Antonio Delaney. He argues that the state failed to establish that any of these alleged victims were almost shot by Robinson or were otherwise "in the line of fire." Without evidence that they were "in the line of fire," Robinson contends that the convictions cannot stand. In support of this argument, Robinson relies on the Ohio Supreme Court's decision in *State v. Mills,* 62 Ohio St.3d 357, 582 N.E.2d 972 (1992). *Mills,* however, is distinguishable from this case.

{¶ 43} In *Mills,* the defendant had been accused of committing several felonious assaults during the commission of a bank robbery. The Supreme Court vacated one of those counts against a teller who was standing off to the side of the line of fire and behind a teller counter. In distinguishing the *Mills* case from those felonious assaults involving firing into a crowd, this court explained:

21

The key factual distinction between *Mills* and this case is the proximity of the shooter to the victim and how that proximity demonstrates an intent to hit a desired target. If a shooter fires a shot at a target standing within point-blank range, it can be inferred that the shooter intends to hit that target to the exclusion of other targets within the periphery. When, as here, the targets are considerably farther away, and aiming is made more difficult because the shooter is in a moving vehicle, it can reasonably be inferred that the shooter is intending to shoot within a much wider target range. Hence, anyone standing within that wider target range can be an intended target, regardless of whether the shooter hits the mark. Of course, the greater the range and difficulty of the shot, the less likely it may be that a bullet will hit its intended target. But that fact alone does not overcome an intent to hit a target—it simply makes a successful shot that much more unlikely.

*Ivory,* 8th Dist. Cuyahoga No. 83170, 2004–Ohio–2968, ¶ 8.

{¶ 44} We find the reasoning of *Ivory* applicable in this case. We further note that the state's prosecution of the felonious assault counts was not limited to Robinson's conduct only. The charges against Robinson were also prosecuted under an aiding and abetting theory, namely, that Robinson was an accomplice to Logan's firing of his gun into the crowd. With that in mind, we turn to whether the state presented sufficient evidence that Logan or Robinson committed a felonious assault against each of the five named victims. After a careful review of the evidence, and construing the evidence in a light most favorably to the state, we find sufficient evidence to support the convictions.

{¶ 45} The record reveals that chaos erupted amongst a crowd of approximately 20 people in the street immediately after Logan started shooting. In turn, most of the crowd began to run toward Euclid Avenue to avoid being hit from the shots fired by Logan and Robinson. The state offered both direct and circumstantial evidence establishing that both Logan and Robinson shot their firearms back into the crowd—Logan's in the direction straight back toward Euclid Avenue, and Robinson's in the direction closer to the tree lawn where Bubbles fell. All five victims were behind the car and in the crowd that was fired upon.

{¶ 46} Given the chaotic scene and the numerous shots fired, we find this testimony sufficient to establish that Robinson either as the principal offender or as an aider or abetter "knowingly * * * attempt[ed] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2).

{¶ 47} According, we overrule the second assignment of error.

(Ex. 14, Doc. 7-1, at 211-13); *Robinson*, 2013 WL 5517978, at *6-7. The appellate court also rejected Petitioner's argument that the trial court erred in giving an aiding and abetting jury instruction, finding there was sufficient evidence that Petitioner provided assistance to Logan and shared his criminal intent. (Ex. 14, Doc. 7-1, at 220-23); *Robinson*, 2013 WL 5517978, at 11-12.

{¶ 63} Robinson argues in his fifth assignment of error that the trial court erred in instructing the jury that it could find him guilty of aiding and abetting Jeremy Logan when there was no evidence that he aided and abetted Logan's criminal conduct. Robinson contends that the state failed to present any evidence that he "provided any assistance or encouragement to Logan and shared his culpable mental state at the time Logan fired his gun."

To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.

*State v. Johnson,* 93 Ohio St.3d 240, 245–246, 754 N.E.2d 796 (2001). The defendant's intent may be inferred from the circumstances surrounding the crime. *Id.* at 246, 754 N.E.2d 796.

{¶ 64} Additionally, the defendant's mere association with the principal offender is not enough to prove complicity. *State v. Mootispaw,* 110 Ohio App.3d 566, 570, 674 N.E.2d 1222 (4th Dist.1996). The defendant must have had some level of active participation by way of providing assistance or encouragement. *State v. Nievas,* 121 Ohio App.3d 451, 456, 700 N.E.2d 339 (8th Dist.1997); *State v. Sims,* 10 Ohio App.3d 56, 58, 460 N.E.2d 672 (8th Dist.1983).

{¶ 65} Robinson argues that the aiding and abetting instruction was not proper because the only evidence shows that Robinson provided assistance after Logan fired his gun, which he contends only evidences proof of an "accessory after the fact." We disagree.

{¶ 66} As recognized by the Ohio Supreme Court in *Johnson,* the defendant's "'participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" *Id.* at 245, 754 N.E.2d 796, quoting *State v. Pruett,* 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971). The evidence at trial revealed that Logan always carried a gun after having been shot and that Robinson specifically asked Logan to accompany him to The One Way "because he didn't want to be up there by himself in a fight."

23

The state offered the testimony of Stephanie Robinson, who testified that she saw the passenger pull out a gun after being punched but that the passenger's gun "jammed" and the "driver [got] it to work."

{¶ 67} Additionally, Paul Small testified that, immediately after Logan was punched and prior to Logan firing his gun, the car pulled slightly forward. Similarly, another witness testified that the car moved slightly forward while the passenger "inched out" his window before starting to fire. This testimony reveals that Robinson, who was driving the car, did not drive away; instead, he operated the vehicle in such a manner to allow Logan to position himself on the car door window prior to Logan firing his gun. This evidence reveals that Robinson shared in Logan's criminal intent to fire the firearm out of the vehicle and that he assisted him in doing so.

{¶ 68} Based on this collective evidence, we cannot say that the trial court erred in giving an aiding and abetting instruction. The fifth assignment of error is overruled.

(Ex. 14, Doc. 7-1 at 219-23); *Robinson*, 2013 WL 5517978, at *11-12.

Petitioner points to testimony from each of the five felonious assault victims to argue there was insufficient evidence to show each was "in the line of fire." (Doc. 11, at 16). He also contends the evidence was insufficient to show he aided and abetted Logan's act of shooting. Upon review of the evidence presented and the applicable law, the Court finds there was sufficient evidence to uphold Petitioner's conviction for the five felonious assaults.

Preliminarily, while Petitioner now styles his objection to the aiding and abetting jury instruction as a sub-part of his sufficiency argument, he did not do so before the state courts. There Petitioner argued, citing only state law, the trial court erred in giving the instruction. (Ex. 12, Doc. 7-1, at 105-07). He did not include it in his sufficiency argument. *See id.* at 101-03. And the appellate court addressed the claim under Ohio law. *Robinson*, 2013 WL 5517978, at *11-12. Petitioner did not "fairly present" this claim to the state court in a constitutional context. *Whitings*, 395 F.3d at 613; *Koontz*, 731 F.2d at 368. And because Petitioner failed to raise the issue on direct appeal, he cannot now raise that claim in the Ohio courts, and therefore the claim

24

is procedurally defaulted. *See O'Sullivan*, 526 U.S. at 848, *Caver*, 349 F.3d at 346; *State v. Cole*, 443 N.E.2d 169, 171 (Ohio 1982) (holding that failure to raise issue in direct appeal results in a waiver of those claims under *res judicata*).[7]

The remainder of Petitioner's felonious assault sufficiency argument—that each victim was not in the "line of fire"—was properly presented to the state courts. As he did on direct appeal, Petitioner argues *State v. Mills*, 62 Ohio St. 3d 357 (1992), controls here. The appellate court distinguished *Mills*, a case involving a bank robbery involved shooting, and applied the reasoning in *State v. Ivory*, 2004 WL 1274383 (Ohio Ct. App., June 10, 2004), a drive-by shooting case. *Ivory* clarified that the felony assault "line of fire" is necessarily broader when a person is shooting from a moving vehicle. *Id.* at *2. To the extent Petitioner is challenging the state appellate court's determination as to the evidence necessary to satisfy the elements of felonious assault under Ohio law, this Court is bound by the state court's interpretation of state law. *Sanford v. Yukins*, 288 F.3d 855, 862 (6th Cir. 2002) ("'What is essential to establish an element, like the question whether a given element is necessary, is a question of state law.'") (quoting *Bates v. McCaughtry*, 934 F.2d 99, 103 (7th Cir. 1991)).

---

7. Moreover, even if this claim were not defaulted, it is without merit. In federal habeas proceedings, errors in jury instructions are generally not cognizable unless they deprive a defendant of a fundamentally fair trial. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Wood v. Marshall*, 790 F.2d 548, 551-52 (6th Cir. 1986) ("In a habeas proceeding, allegedly improper jury instructions must be shown to have infected the accused's trial to such a degree to constitute a clear violation of due process. The petitioner must show more than that the instructions are undesirable, erroneous or universally condemned."). Styled this way, or as Petitioner now does as a sub-part of his sufficiency claim, the claim lacks merit. The appellate court pointed to evidence in the form of testimony from Paul Small that Petitioner drove the car in such a manner that permitted Logan to shoot more effectively and evidence that Petitioner wanted Logan present specifically because Logan carried a gun and there was going to be a fight. Taking the facts in the light most favorable to the prosecution, this is sufficient evidence on which a jury could believe the state's theory that Petitioner aided and abetted Logan's shooting. Because there was sufficient evidence to support the jury instruction, it cannot be said that the jury instruction rendered Petitioner's trial fundamentally unfair.

As the appellate court found, the testimony from the five felonious assault victims indicates each was on or near Garfield Street ("The One Way"), behind Petitioner's car, at the time either Logan or Petitioner shot. Latima Brown stated she was at the "end of the gate" near Euclid when she saw the driver shoot. (Tr. 286). Devin Delaney stated she was running towards Euclid after the passenger started shooting and "jumped over a gate" into a parking lot. (Tr. 429). Kayla Moorer testified she was in the middle of the street behind the car—the distance between the witness stand and the lawyers' tables at trial—when the passenger shot, and ran when she saw "the driver shooting at the crowd." (Tr. 591-93; *see also* 601-04, 608). Darylisa Crenshaw testified she was running toward Euclid near her ex-boyfriend and Bubbles when the passenger began shooting. (Tr. 405-07). Antonio Delaney testified he walked up Garfield toward where the crowd had gathered (Tr. 613), and when the shooting started, the crowd on the street began to run toward Euclid (Tr. 615). Antonio Delaney testified Bubbles was about 30 feet away from him when he first heard gunshots, and he ran also. (Tr. 614-16). Though these are not precise locations, viewing the facts and reasonable inferences in the light most favorable to the prosecution, a rational trier of fact could have found all five victims were within the target range of the shots fired by either Petitioner or Logan. Thus, the appellate court's conclusion that a rational trier of fact could have found Petitioner knowingly attempted to cause physical harm to the five felonious assault victims by firing toward them, and enabling Logan to fire toward them is not unreasonable. As such, the undersigned recommends Ground Two be denied.

### Ground Three – Appellate Court Decision Rationale (Due Process)

In his third ground, Petitioner argues his due process rights were violated when the appellate court "affirmed his conviction based in whole or in part on a legal theory that was never presented to the jury." (Doc. 1-1, at 12). Respondent contends this is not a cognizable claim because "the alleged error was entirely within the Ohio appellate court's manifest weight

analysis, and manifest weight claims are not cognizable in federal habeas corpus." (Doc. 7, at 25). Respondent contends that because the underlying manifest weight claim is not a constitutional claim, "any alleged error in the state court's analysis of that claim cannot amount to a constitutional error." *Id.* For the reasons discussed below, the undersigned recommends Ground Three be denied.

It violates due process for a court to uphold a criminal conviction on the basis of a charge not presented to a jury. *Cole v. Arkansas*, 333 U.S. 196, 201 (1979) (finding a violation of due process when a state court affirmed a conviction based on a different section of the statute than that which with the defendant was charged); *Dunn v. United States*, 442 U.S. 100, 106 (1979) ("To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends most basic notions of due process."); *see also McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991) ("Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury."). In *Dunn*, the defendant was indicted, tried, and convicted based on false statements at a hearing held on a particular date, but when the appeals court examined the case, it chose to affirm on the basis of a statement made on a different date not mentioned in the indictment. 442 U.S. at 105-06.

Applying *Cole* and *Dunn*, the First Circuit Court of Appeals granted a writ of habeas corpus when a state appellate court upheld a petitioner's conviction on specific acts for which he had not been indicted. *Cola v. Reardon*, 787 F.2d 681, 691-97 (1st Cir. 1986). In *Cola*, the indictment charged the defendant for unlawful representation because he negotiated certain loans and paid the debts of another, but failed to charge him for the offense on which the appellate court upheld the conviction—that he illegally represented another at a bankruptcy hearing. *Cola*,

27

787 F.2d at 691-93. The *Cola* court concluded "that, in order for any appellate theory to withstand scrutiny under *Dunn*, it must be shown to be not merely before the jury due to an incidental reference, but as part of a coherent theory of guilt that, upon reviewing the principal stages of trial, can be characterized as having been presented in a focused or otherwise cognizable sense." *Id.* at 693.

In addressing Petitioner's manifest weight claim, the Ohio appellate court stated:

{¶ 51} In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden,* 8th Dist. Cuyahoga No. 92266, 2009–Ohio–3598, ¶ 12. When reviewing a claim challenging the manifest weight of the evidence, "the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). After reviewing the entire record, the reviewing court must

> weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*Id.*

### Felony Murder

{¶ 52} In arguing that his conviction for felony murder is against the manifest weight of the evidence, Robinson relies principally on the same argument that he raised in his first assignment of error, namely, that the eyewitness testimony linking him to the murder is not credible because the physical evidence excludes him. Specifically, Robinson points to the testimony of the deputy medical examiner, Dr. McCollom, who stated that Bubbles had "stippling" on her face, which is indicative that the shooter was within three feet from her. Robinson contends that this testimony excludes him as the shooter "because he shot from his car which was on the east side of a one-way street near 1826 Garfield Road, whereas [Bubbles] was shot on the west side of the street on a grassy area along the sidewalk and adjacent to the fence opposite 1818 Garfield." He further argues that most eyewitnesses testified that Bubbles was running away from the car; thus, if he had shot her from his car, the entrance wound would have been in the back of her head, not her face.

{¶ 53} While we acknowledge that Robinson raises a compelling argument that Bubbles may have been killed by someone from her own group during crossfire, we still cannot say that the jury "lost its way" in this case.

{¶ 54} First, although we agree that the record evidences Bubbles's location at the time of her fall from the fatal shooting, the evidence does not conclusively establish Robinson's exact location at the time that he fired his gun. Whereas Robinson contends that his shot would have been fired at least 80 feet south and 20 feet west from Bubbles, other testimony at trial established that Bubbles was much closer to Robinson's car. For example, Antonio Delaney testified that Bubbles was approximately 15 feet from the car. Additionally, although there was testimony that Bubbles was running away from the car after the first shots were fired, we note that Bubbles was shot "lateral to her right eye." Despite running away, Bubbles could have been shot if she had turned her head to look back after the pause in the first set of shots. Finally, we must emphasize that, aside from some of the occupants in Robinson's car, almost all of the eyewitnesses either testified that there was no shooting from the crowd toward the car or that the only shooting from the crowd occurred after Bubbles had fallen down. Notably, even Russell Stokes, who was not a party to Bubbles's group, testified to this fact. We find these facts to be important when considering the weight of Dr. McCollom's testimony.

{¶ 55} Even assuming that Bubbles was not within three feet of Robinson when he fired his gun outside his car window, we still cannot say that a manifest miscarriage of justice has occurred. Indeed, Robinson's manifest weight of the evidence challenge is premised on the notion that Dr. McCollom's testimony regarding the existence of stippling and the corresponding distance of the shooter was infallible. The jury, however, was free to disbelieve Dr. McCollom's testimony. Further, Robinson's argument ignores the very function of the jury, namely, to resolve conflicts in the evidence. The jury heard from several witnesses whose testimony could reasonably be construed to mean one thing: Robinson shot and killed Bubbles.

{¶ 56} It is well settled that the credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts primarily to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). As the Second District has explained:

> [B]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.

29

*State v. Lawson,* 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709, 1997 WL 476684 (Aug. 22, 1997).

{¶ 57} Moreover, we find Robinson's challenge to his felony murder conviction flawed for another reason: the jury didn't have to believe that Robinson's shot actually killed Bubbles to convict him of the felony murder count. Under Ohio's felony-murder doctrine, "a defendant may be held criminally liable for the unintended death that results from the commission of a first or second degree felony." *State v. Tuggle,* 6th Dist. Lucas No. L–09–1313, 2010–Ohio–4162, ¶ 101. In *State v. Dixon,* 2d Dist. Montgomery No. 18582, 2002 Ohio App. LEXIS 472, 2002 WL 191582 (Feb. 8, 2002) (abrogation recognized on other grounds), the court explained that under the "proximate cause theory" of felony murder:

> [I]t is irrelevant whether the killer was the defendant, an accomplice, or some third party such as the victim of the underlying felony or a police officer. Neither does the guilt or innocence of the person killed matter. A defendant can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the "proximate result" of defendant's conduct in committing the underlying felony offense; that is, a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience.

*Dixon* at *14–15, citing *State v. Chambers,* 53 Ohio App.2d 266, 269, 373 N.E.2d 393 (9th Dist.1977). *See State v. Bumgardner,* 2d Dist. Greene No. 97–CA–103, 1998 Ohio App. LEXIS 3856, 1998 WL 892120 (Aug. 21, 1998); and *State v. Lovelace,* 137 Ohio App.3d 206, 738 N.E.2d 418 (1st Dist.1999).

{¶ 58} Here, the testimony offered at trial established at a minimum that Robinson fired his gun toward Bubbles. Even if his bullet missed Bubbles, this does not protect him from criminal liability. We find that it is foreseeable that someone in a crowd, gathered for a fight, will shoot back if first fired upon. *See State v. Abdi,* 4th Dist. Athens No. 09CA35, 2011–Ohio–3550. Notably, "even intervening criminal conduct does not prevent an offender's actions from being the proximate cause so long as that intervening conduct was foreseeable." *Id.* at ¶ 76, citing *Lovelace* at 219, 738 N.E.2d 418 (holding that police officer's criminal conduct during a high-speed chase, which directly caused a motorist's death, was foreseeable, and therefore, defendant could be held criminally liable for proximately causing the motorist's death). Thus, we find that the conviction must stand because (1) the weight of the evidence establishes that Robinson committed a felonious assault against Bubbles, even if it was an attempt to inflict serious physical harm by virtue of shooting in her direction, and (2) his felonious assault proximately caused her death, even if it was through the crossfire retaliating back.

(Ex. 14, Doc. 7-1 at 214-19); *Robinson*, 2013 WL 5517978, at *8-10.

As a preliminary matter, Respondent is correct (and Petitioner does not dispute) that manifest weight arguments are not cognizable in habeas proceedings. *See Johnson v. Havener*, 534 F.2d 1232, 1234 (6th Cir. 1976); *Ross v. Pineda*, 2011 WL 1337102, at *3 (S.D. Ohio) ("Whether a conviction is against the manifest weight of the evidence is purely a question of Ohio law.") (citing *State v. Thompkins*, 78 Ohio St. 3d 380 (Ohio 1997)); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (errors in the application of state law are not cognizable in federal habeas corpus proceedings). Rather, Petitioner contends the appellate court violated his due process and jury trial rights when it upheld his conviction (as not against the manifest weight of the evidence) on a "cross-fire theory" never presented to the jury.

Importantly, the appellate court here *first* determined the evidence produced at trial was sufficient to conclude Petitioner shot Bubbles. *Robinson*, 2013 W 5517978, at *9 (summarizing the evidence and Petitioner's argument, then holding: "[t]he jury heard from several witnesses whose testimony could reasonably be construed to mean one thing: Robinson shot and killed Bubbles."). This basis was the primary theory of guilt presented to the jury and the appellate court's first basis for upholding the conviction against Petitioner's manifest weight argument. *Id.* at 9-10. The court then turned to Petitioner's argument on appeal—that he could not be the shooter, because he was not within the three-foot range opined by Dr. McCollum. In addressing that argument, the court explained that a felony murder charge in Ohio can be supported by a death that is the proximate result of a defendant's felonious conduct. *Id.* at *10 ("*Moreover*, we find [Petitioner's] challenge to his murder conviction flawed for *another* reason.") (emphasis

added).[8] Although Petitioner is correct that the state primarily argued Petitioner shot Bubbles, this is not at odds with the appellate court's first, independent, theory of guilt. In these circumstances, the undersigned cannot conclude Petitioner's due process rights were violated, and as such, recommends Ground Three be denied.

### Grounds Five & Six – Prosecutorial Misconduct (Due Process) & Ineffective Assistance of Counsel (Sixth Amendment)

Petitioner's final two grounds for relief are interrelated. First, he contends his due process rights were violated by prosecutorial misconduct during closing argument. Second, he contends he was denied effective assistance of counsel in violation of the Sixth Amendment based on his counsel's failure to object to the prosecutor's statements. Respondent contends Petitioner's prosecutorial misconduct claim is procedurally defaulted, and he has not shown cause and prejudice to excuse the default. Respondent further contends that even if not defaulted, Petitioner's prosecutorial misconduct claim lacks merit. Finally, Respondent contends Petitioner's ineffective assistance of counsel claim is also without merit either to serve as cause and prejudice, or as an independent claim.

The Ohio appellate court addressed Petitioner's prosecutorial misconduct and ineffective assistance of counsel claims:

*Prosecutorial Misconduct*

{¶ 76} In his seventh assignment of error, Robinson argues that he was denied his due process right to a fair trial as a result of prosecutorial misconduct. He argues that the prosecutor's statements in his final closing argument were calculated "to improperly influence the jury with arguments that had absolutely no basis in the evidence."

_____

8. Petitioner, also, on direct appeal, repeatedly referred to this as the state's "fall-back" or "alternative" theory. *See* Ex. 12, Doc. 7-1, at 97, 105, 107. Although Petitioner disputed whether this theory should have been presented to the jury, he seemed to acknowledge that it was.

{¶ 77} The standard of review for prosecutorial misconduct is whether the comments and questions by the prosecution were improper, and, if so, whether they prejudiced appellant's substantial rights. *State v. Treesh,* 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). Prosecutorial misconduct will not provide a basis for reversal unless the misconduct can be said to have deprived the appellant of a fair trial based on the entire record. *State v. Lott,* 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Gapen,* 104 Ohio St.3d 358, 2004–Ohio–6548, 819 N.E.2d 1047, ¶ 92, quoting *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶ 78} There was no objection to the alleged instances of prosecutorial misconduct; therefore, Robinson has waived all but plain error. *State v. Bryan,* 101 Ohio St.3d 272, 2004–Ohio–971, 804 N.E.2d 433, ¶ 175; *State v. Ballew,* 76 Ohio St.3d 244, 254, 667 N.E.2d 369 (1996). The plain error rule is to be invoked only under exceptional circumstances in order to avoid a manifest miscarriage of justice. *State v. Long,* 53 Ohio St.2d 91, 95, 372 N.E.2d 804 (1978). Plain error does not occur unless, but for the error, the outcome of the trial clearly would have been different. *Id.* at 97, 372 N.E.2d 804; Crim.R. 52(B).

{¶ 79} According to Robinson, the most important piece of exculpatory evidence in this case was the testimony of the medical examiner, Dr. McCollom, indicating that the victim was shot in the face at close range based on the presence of "stippling." Robinson contends that the prosecutor improperly attacked this testimony in closing argument by misconstruing the evidence and by intentionally confusing the jury as to the testimony of other experts.

{¶ 80} Although prosecutors are entitled to considerable latitude in opening and closing arguments, they must nevertheless avoid insinuations and assertions calculated to mislead. *Lott,* 51 Ohio St.3d at 166, 555 N.E.2d 293. "They may not express their personal beliefs or opinions regarding the guilt of the accused, and they may not allude to matters not supported by admissible evidence." *Id.* The prosecutor is, however, permitted to fairly comment on the credibility of witnesses based on the witnesses' testimony at trial. *State v. Williams,* 8th Dist. Cuyahoga No. 90739, 2012–Ohio–1741, ¶ 12, citing *State v. Price,* 60 Ohio St.2d 136, 140, 398 N.E.2d 772 (1979). Courts must review the statement within the context of the entire trial. *Id.*

### 1. Remarks that Dr. McCollom is not a ballistics expert

{¶ 81} Robinson first points to the prosecutor's statements attacking Dr. McCollom's qualifications to render an opinion on stippling and corresponding distance of the shooter, wherein the prosecutor emphasized first that Dr. McCollom is "qualified as an expert in the area of forensic pathology, not ballistics, okay," and then later reiterated again that the "pathologist is not a ballistics expert." Robinson argues that the prosecutor's remarks were improper

because there was no evidence that Dr. McCollom was not qualified to offer her scientific opinion regarding the stippling, and the prosecutor's personal opinion of her testimony was improper. We disagree.

{¶ 82} While it is true that the defense effectively elicited testimony from Dr. McCollom regarding stippling and the corresponding implication of a close range shooter, which the prosecutor never tried to contradict or impeach through re-direct of Dr. McCollom, we do not believe that alone prohibits the prosecutor from commenting on the credibility of this testimony. Notably, Dr. McCollom was not offered as a ballistics expert, nor did she hold herself out to be one. The prosecutor's remarks on this issue therefore were not improper.

### 2. Testimony mocking the defense's argument

{¶ 83} Robinson further contends that the prosecutor "denigrated its own expert witness and intentionally misconstrued the defense argument in an attempt to make it ridiculous." He complains of the following remarks:

> [T]his testimony about the stuff that comes flying out of the end of a gun, this burned residue and this powder, a couple of dots around her face as if, you know, the big game changer, there is a real killer out there * * * [and] shoots Bubbles in the face, one of her friends, somebody must have wanted to do her in, right? If that's the defense, that's a bad defense, really bad. Another killer.

{¶ 84} While we find the prosecutor's remarks to be obnoxious, we cannot say that it rises to the level of prosecutorial misconduct. The prosecutor was giving his take on the defense's theory as stated in the closing argument. And even assuming that such characterization was improper, we find no basis to believe that these statements affected the outcome of the trial.

### 3. Misstating the relevance of other experts' testimony and mischaracterizing their testimony

{¶ 85} Robinson also argues that the prosecutor improperly implied that Dr. McCollom's testimony was somehow rendered invalid because Robinson did not ask the firearms expert any questions to corroborate McCollom's testimony. Robinson contends that these statements improperly imply (1) that Andrew Chappell, the firearms expert, would have contradicted Dr. McCollom's testimony—something that was never established at trial—and further (2) that the burden somehow rested with the defense to disprove the state's case. Robinson specifically points to the following remarks:

> But right after [Dr. McCollom], we had a ballistics expert up here and testifying, right. A guy, [defense counsel] says, is a terrific expert, well qualified. Well, ask him the question, right? Ask him

34

the question about the distance of this gunshot residue. Why don't you.

* * *

[The defense] want to wrap their arms around [Dr. McCollom] because she said this bit about fluid distance of gunshot residue and get the ballistics expert up here, ask Andy [Chappell] some questions. You know, ask Andy some questions about that. * * *

{¶ 86} He further points to the prosecutor's characterization of the testimony of the trace evidence expert, Martin Lewis, as not being entirely accurate and misleading. Although Lewis testified on cross-examination that the FBI no longer tests for gunshot residue at their laboratory, he specifically denied that the decision had anything to do with the reliability of gunshot residue testing. Relying on Lewis's testimony in closing argument, the prosecutor stated this testimony illustrated that "the stuff" Dr. McCollom testified to "is mushy." The prosecutor further elaborated: "It's all the same stuff. It blasts out, FBI doesn't use it any more, we know that. It's just murky. This stuff, it's like that [Lewis] testified to."

{¶ 87} We find these highlighted comments by the prosecutor to be improper. There was no evidence that Chappell would have contradicted McCollom's testimony, and there is no burden upon the defense to disprove the state's case. We further agree with Robinson that the prosecutor's argument related to the gunshot residue was misleading because Lewis did not testify that gunshot residue testing was murky or unreliable and because it mixes two very different types of scientific analysis, namely, gunshot residue testing versus the forensic significance of stippling.

{¶ 88} We, however, cannot say that these comments deprived Robinson of a fair trial or impacted the outcome of the trial. First, while appellant's counsel has effectively highlighted these comments, these comments must be taken in context with the entire closing argument. These comments were part of a long closing argument where the prosecutor also repeatedly emphasized the jury to follow the jury instructions, *e.g.,* "Please don't take anything I say as the gospel, just use the evidence and instructions, throw anything I say out the window." Notably, as stated above, defense counsel did not object to any of these remarks. When considered in context, we do not believe that any of these comments would unduly influence the jury in the performance of their job.

{¶ 89} Second, the trial court specifically instructed the jury that opening statements and closing arguments of counsel were not evidence, and that the jury was to decide the case solely on the evidence presented. *See State v. Sheffey,* 8th Dist. Cuyahoga No. 98944, 2013–Ohio–2463, ¶ 50. We have no basis to conclude that the jury did not follow this instruction.

{¶ 90} The seventh assignment of error is overruled.

*Ineffective Assistance of Counsel*

{¶ 91} In his eighth assignment of error, Robinson argues that he was denied effective assistance of counsel because his trial counsel failed to object to the prosecutor's improper remarks discussed in the preceding assignment of error.

{¶ 92} To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington,* 466 U.S. 668, 687–688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.

{¶ 93} Having already found that the improper remarks made by the prosecutor in closing argument would not have changed the outcome of the trial, we cannot say that Robinson was prejudiced by his defense counsel's failure to object.

{¶ 94} The eighth assignment of error is overruled.

(Ex. 14, Doc. 7-1 at 226-32); *Robinson*, 2013 WL 5517978, at *14-17.

As a preliminary matter, Respondent contends—and Petitioner does not contest—that Petitioner's prosecutorial misconduct claim is procedurally defaulted. A procedural default may occur where "the last state court to render a judgment in the case rejected the claim because it was not presented in accordance with the state's procedural rules." *Hargrave-Thomas v. Yukins*, 374 F.3d 383, 387 (6th Cir. 2004). Each of the Sixth Circuit's *Maupin*, 785 F.2d at 138, factors for a claim to be procedurally defaulted is satisfied—the failure to object these portions of the prosecutor's closing at trial invoked Ohio's forfeiture rule; the Ohio appellate court enforced this procedural rule by applying plain-error review to this issue in Petitioner's state appeal, *Robinson*, 2013 WL 5517978, at *14; and this procedural forfeiture is an independent and adequate state ground foreclosing review, s*ee, e.g.*, *Scott v. Mitchell*, 209 F.3d 854, 866-71 (6th Cir. 2000).

Petitioner's prosecutorial misconduct claim is thus procedurally defaulted and he must show cause and prejudice to excuse the default. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

36

Petitioner argues his procedural default should be excused because his trial counsel was constitutionally ineffective for failing to object to the prosecutor's remarks during closing argument and he was prejudiced as a result. He also asserts ineffective assistance of counsel as a separate ground. Because the undersigned finds Petitioner cannot show prejudice, the undersigned recommends Grounds Five and Six be dismissed.

 "An argument that ineffective assistance of counsel should excuse a procedural default is treated differently than a free-standing claim of ineffective assistance of counsel. The latter must meet the higher AEDPA standard of review, while the former need not." *Hall v. Vasbinder,* 563 F.3d 222, 236-37 (6th Cir. 2000). Thus, review of this claim is *de novo. Id.*; *Hale v. Burt*, 645 F. App'x 409, 416 (6th Cir. 2016). To establish ineffective assistance of trial counsel, Petitioner must show: 1) his counsel's performance "fell below an objective standard of reasonableness", and 2) the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687–688 (1984).

Strickland *Prejudice*

"A court need not assess counsel's deficient performance before considering prejudice, where the latter inquiry is an easier one." *Altman v. Winn*, 644 F. App'x 637, 641 (6th Cir. 2016) (citing *Strickland,* 466 U.S. at 697). Even if the court here assumes *arguendo* the prosecutor's remarks were improper, the pertinent prejudice question is whether Petitioner can establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.[9] The prejudice component

---

9. Because the court need not reach Petitioner's prosecutorial misconduct argument on the merits, it need not wade into Petitioner's argument about the appropriate standard of review when the state appellate court applies plain error review, *see* Doc. 11, at 24, which is the subject

"focuses the question on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

The comments Petitioner objects to take up less than two transcript pages of the state's rambling, somewhat disjointed, twenty page rebuttal closing argument. *See* Tr. 1050-69. The trial court instructed the jury, both before, and immediately after the closing arguments, that such arguments were not evidence. *See* Tr. 962 ("[O]pening statements and closing arguments do not constitute evidence in this case and they shall not be considered as evidence by the jury."); Tr. 1069 ("First of all, let me say this. The jury's recollection controls, okay. If any reference by the Court or counsel to matters of evidence does not coincide with your own recollection, it's your own recollection that should control your deliberations, okay."). And the state, in its rebuttal closing argument, noted the same. *See* Tr. 1065 ("Please don't take anything I say as the gospel, just use the evidence and instructions, throw anything I say out the window."); Tr. 1069 ("Again, don't take what my comments are.").

Although Petitioner argues the prosecutor's allegedly-improper rebuttal closing argument provides the only reason the jury could have had for disbelieving Dr. McCollum, this is not true. As discussed above regarding Petitioner's sufficiency argument, the jury also had the testimony of several eyewitnesses who testified Bubbles did not fall until after Petitioner shot and that no one else was shooting at the time of her death. Thus, the jury had before it two conflicting

---

of an intra-circuit split in the Sixth Circuit. *See Trimble v. Bobby*, 804 F.3d 767, 777 (6th Cir. 2016) (noting the conflict between *Fleming v. Metrish*, 556 F.3d 520, 632 (6th Cir. 2009) (applying AEDPA deference to court's substantive reasoning in plain-error analysis) and *Frazier v. Jenkins*, 770 F.3d 485 F.3d 485, 496 n.5 (6th Cir. 2014) (noting, in a footnote, that "plain-error review is not equivalent to adjudications on the merits, which would trigger AEDPA deference")).

propositions—one, the state's theory of the case that Petitioner shot Bubbles based on eyewitness testimony, and two, the testimony of Dr. McCollum regarding how far away the shooter was, which seemingly contradicted the eyewitness testimony. In light of this, and the factors discussed above—that the comments were brief, and the trial court's and the prosecutor's statements reminding the jury that closing arguments are not evidence—the undersigned cannot conclude that there is a "reasonable probability" that but for counsel's failure to object, "the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. Although review here is *de novo* in determining cause and prejudice, the undersigned notes that the Ohio appellate court came to a similar conclusion—that the comments "were part of a long closing argument where the prosecutor also repeatedly emphasized the jury to follow the jury instructions" and "the trial court specifically instructed the jury that opening statements and closing arguments of counsel were not evidence, and that the jury was to decide the case solely on the evidence presented" and therefore "[the court] cannot say that these comments deprived [Petitioner] of a fair trial or impacted the outcome of the trial." *Robinson*, 2013 WL 5517978, at *16. For all of these reasons, the undersigned concludes Petitioner cannot show his counsel's performance "render[ed] the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart*, 506 U.S. at 372.

Therefore, because Petitioner cannot show prejudice to overcome his procedurally defaulted prosecutorial misconduct claim, the undersigned recommends Ground Five be dismissed.[10]

*Independent Ineffective Assistance of Counsel Claim*

---

10. The other way to overcome a procedural default is to show "actual innocence." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Petitioner makes no such claim in his pleadings.

Because Petitioner cannot show ineffective assistance of counsel satisfies the prejudice necessary to overcome the procedural default for his prosecutorial misconduct claim on *de novo* review, his ineffective assistance of counsel claim on the same basis also fails.[11] The undersigned therefore recommends Ground Six be dismissed.

Petitioner presents compelling arguments about the evidence presented and how a jury could have drawn a different conclusion from that evidence. As discussed above, Petitioner has not, however, shown that his Constitutional rights were violated, as is required for habeas relief.

### CONCLUSION AND RECOMMENDATION

Following review, and for the reasons stated above, the undersigned recommends the Petition be denied in its entirety.

s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

---

11. As a result, the court need not reach Petitioner's argument that the Ohio Supreme Court misapplied *Strickland* to his independent ineffective assistance of counsel claim. *See* Doc. 11, at 24-25. This is so because the court already applied a *de novo* review to Petitioner's ineffective assistance of counsel claim in addressing whether Petitioner could overcome his default.